**FILED IN CAMERA AND UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **[UNDER SEAL],** | * | **CIVIL ACTION** |
| **,** | * | |
| | * | **FILE NO. _____** |
| **Relator,** | * | |
| | * | |
| **v.** | * | **FILED UNDER SEAL** |
| | * | **PURSUANT TO** |
| | * | **31 U.S.C. § 3730(b)(2)** |
| | * | |
| **[UNDER SEAL]** | * | |
| | * | **Jury Trial Demanded,** |
| **Defendant.** | * | **Pursuant to Fed. R. Civ. P. 38** |
| | * | |

**DO NOT PLACE ON PACER
DO NOT SERVE DEFENDANTS
DO NOT PLACE IN PRESS BOX**

**<u>FILED UNDER SEAL</u>**

**FILED IN CAMERA AND UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CIVIL ACTION** |
| *ex rel.* **Braeden M. Hearrell,** | * | |
| | * | **FILE NO. _____** |
| **Relator,** | * | |
| | * | |
| **v.** | * | **FILED UNDER SEAL** |
| | * | **PURSUANT TO** |
| | * | **31 U.S.C. § 3730(b)(2)** |
| | * | |
| **Allergan, Inc.,** | * | |
| | * | **Jury Trial Demanded,** |
| **Defendant.** | * | **Pursuant to Fed. R. Civ. P. 38** |
| | * | |

-------------------------------------------------------------------------------------------

**COMPLAINT**

-------------------------------------------------------------------------------------------

Braeden M. Hearrell brings this action to recover damages and civil monetary penalties on behalf of the United States of America arising from Defendant Allergan, Inc.'s ("Allergan") violations of the False Claims Act, 31 U.S.C. § 3729 – 3733 ("FCA").

## SUMMARY OF FALSE CLAIMS

### 1.

Allergan has violated the FCA by engaging in the following four categories of misconduct, each of which resulted in the submission of false or fraudulent claims for both Allergan's product Botox and physician injection services to Medicare, Medicaid, or other federal health care programs.

(a)  <u>*Off-Label*</u> Promotion and False Statements to Doctors:  Allergan has made, and has caused others to make, false and fraudulent statements to physicians regarding Botox's efficacy (as well as scientific and clinical evidence in support thereof) for the treatment of migraine headaches in children.  These false statements were made through concerted and

-2-

coordinated efforts of Allegan management and employees in different divisions of the company to aggressively promote Botox for unapproved indications, and the statements resulted in the submission of claims for drugs and injection services that were not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member" as is required by the Medicare Statute. *See, e.g.,* 42 U.S.C. § 1395y(a)(1)(A).

These statements were made through:

(i)     Allergan's salesman (currently known as "Health Systems Managers") during visits with doctors that treat children;

(ii)    Allergan's MSLs (currently known as "Medical Scientific Liaisons") during visits with doctors that treat children;

(iii)   *Off-label* injection training sessions and workshops that Allergan funded, scheduled, and  coordinated and which were conducted by Allergan employees and selected "Key Opinion Leaders" for pediatric specialists;

(iv)    The use of Key Opinion Leaders ("KOLs"), selected by Allergan, to influence their peers in connection with the promotion of Botox for off-label use to treat children for chronic migraine;

(v)     websites that were funded and controlled by Allergan directing the public to pediatric specialists for chronic migraine;

(vi)    the use of promotional dinners attended by Key Opinion Leaders and Medical Scientific Liaisons to promote the off-label use of Botox to pediatric specialists for chronic migraine in children.

FILED IN CAMERA AND UNDER SEAL

(b)     Miscoding and Altering Records:  In an effort to conceal the *off-label* and non-reimbursable nature of Botox use for chronic migraine in minors, Allergan has taught, coached, and encouraged physicians and their staffs, as well as the staffs of hospitals and other medical institutions to code (*e.g.,* ICD-10-CV and CPT codes) to otherwise falsely or improperly document patient conditions and treatments provided:

(i)      on claim forms (*e.g.,* CMS 1500 and CMS 1450/UB-92);

(ii)     in electronic or paper records or submissions (*e.g.*, superbills and injection charge sheets) that are provided to physician billing services, clearinghouses, or Medicare contractors (Medicare Carriers, Medicare Fiscal Intermediaries, and the newly formed Medicare Administrative Contractors, hereinafter jointly referenced as "Medicare Contractors") or otherwise used to communicate, record, and/or support such claims; and

(iii)    exemplar letters of medical necessity to health care providers in order for those health care providers to secure pre-approval for the use of Botox to treat chronic migraine in children contrary to FDA approval.

(c)     Kickbacks to Induce Use of Botox Paid for by Federal Health Care Programs:  Allergan has violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, by offering and providing illegal renumeration to physicians, in the form of cash, travel, lodging, and meals, as an inducement to do the following:

(i)      prescribe Botox to patients for both off-label and approved indications;

(ii)     provide corresponding injection services. See, *e.g.*, §§ 116-135.   Because prescriptions for Botox are accompanied by corresponding injection procedures performed by physicians, each time these doctors prescribed Botox for a Medicare

FILED IN CAMERA AND UNDER SEAL

beneficiary, two claims to the Government would result – one for the Botox used (which is bought by the doctor and resold to the Medicare beneficiary) and the other for the doctor's service injecting the product.  Thus, Allergan's kickbacks resulted in false claims for both Botox and physician injection services to the federal Medicare and Medicaid programs, both of which condition the payments of claims and participation in the programs on compliance with the federal Anti-Kickback Statute; and

(iii)    direct cash payments to Key Opinion Leaders who recruited pediatric physicians to attend promotional dinners and other meetings related to  marketing Botox to treat chronic migraine in children.

## THE COURT'S JURISDICTION & VENUE

### 2.

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case arises under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

### 3.

The false claims allegations of this Complaint are not subject to any of the limitations identified in 31 U.S.C. § 3730(e).  In particular this action is not based upon: (a) the facts underlying a pending FCA action, *see* 31 U.S.C. 3730 (b)(5); or (b) the public disclosure of allegations or transactions in the defined categories of hearings, reports, and news media identified in 31 U.S.C. § 3730(e)(4)(A).  In addition, if there has been a public disclosure of any of the

**FILED IN CAMERA AND UNDER SEAL**

allegations underlying this action, Relator qualifies as an "original source[s]" of such information, pursuant to 31 U.S.C. § 3730(e)(4)(B).

**4.**

The Court has personal jurisdiction over Defendant Allergan pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. At all times relevant to this action, up to and including the date of this filing, Defendant Allergan has transacted business in the Eastern District of Texas. In addition, Allergan has committed numerous FCA violations in the district, as more particularly described herein.

**5.**

Venue is proper in this Court pursuant to 28 U.S.C. 1391(c), because Defendant Allergan resides in the Eastern District of Texas in that it has contacts in the district that would be sufficient to subject it to personal jurisdiction if the district were a separate state, and 31 U.S.C. § 3732(a), because Allergan can be found, and transacts business, in the Eastern District of Texas. At all times relevant to this action, Allergan regularly conducted substantial business within the Eastern District of Texas, maintained employees in the district, and made significant sales within the district. In addition, Allergan has committed numerous FCA violations in the district, as more particularly described herein.

FILED IN CAMERA AND UNDER SEAL

## THE PARTIES

## ALLERGAN, INC.

### 6.

Defendant Allergan is a global corporation formed under the laws of the State of Delaware, with its principle executive offices at 2525 Dupont Drive, Irvine, California 92612.  Allergan specializes in manufacturing and marketing specialty pharmaceuticals (eye care, skin care, and neuromodulators) and medical devices (breast implants, gastric bands for obesity surgery, and injectable dermal fillers used on facial wrinkles).

### BOTOX

### 7.

Allergan manufactures a pharmaceutical formulation of botulinum toxin type A, a purified neurotoxin to which it received the rights in 1991 when it acquired Oculinum, Inc., the drug's developer.  Allergan currently markets and sells the toxin in the United States under two distinct trade names:  "Botox" and "Botox Cosmetic."  While the botulinum toxin in these products are exactly the same, Allegan uses separate trade names to distinguish the toxin being sold for therapeutic uses ("Botox") from that sold for cosmetic uses ("Botox Cosmetic").  This action concerns Allergan's marketing of the therapeutic Botox.

### Botox's Limited FDA Approval

### 8.

Botox has limited approval and licensing by the Food and Drug Administration ("FDA") as a biological product and drug.  Although perhaps best known for its use in connection with cosmetic facial aesthetics, Botox was first approved for the treatment of certain neuromuscular disorders.  Botox has received FDA approval for treatment of chronic migraine in adults in 2010.

**FILED IN CAMERA AND UNDER SEAL**

## RELATOR HEARRELL

### Braeden M. Hearrell and His Contacts With Allergan

**9.**

In July, 2017 Braeden M. Hearrell was prescribed Botox for chronic migraine despite the fact that he was only 14 years old.  Within 17 days of receiving the Botox injections for chronic migraine, Braeden Hearrell developed dysautonomia.  Dysautonomia is a condition that involves damages to the autonomic nervous system.  As a result of receiving Botox, Braeden's autonomic nervous system does not function properly and he has postural orthostatic tachycardia syndrome ("POTS").

Per Braeden's treating physicians, dysautonomia is a permanent, lifelong condition.  Braeden cannot be left unattended at any time and cannot drive or otherwise operate a motor vehicle.  Braeden is subject to passing out due changes in his blood pressure which are a direct result of damage to his autonomic nervous system.

On or about March 7, 2019, Braeden Hearrell, by and through his parents instituted a lawsuit against Allergan, Inc.  During the process of developing that lawsuit, Braeden Hearrell came into possession of non-public information related to Allergan's violations of the False Claims Act and its promotion of Botox for off-label uses.

Braeden Hearrell received Botox injections by and through a physician employed by The University of Texas.  The specific physician was subject to all the marketing practices set forth in this Complaint.  Specifically, these practices by Allergan that the specific physician was directly subjected to include, but are not limited to the following:

(1)     the use of Key Opinion Leaders to extol the virtues of Botox for the treatment of chronic migraine in children;

**FILED IN CAMERA AND UNDER SEAL**

(2)    the Key Opinion Leader utilized by Allergan was paid cash for promoting the use of Botox off-label to treat minors for chronic migraine.

(3)    promotional dinners that were attended by both Medical Scientific Liaisons and Key Opinion Leaders;

(4)    injector training provided directly to the specific physician by sales employees of Allergan when those employees knew that the specific physician was a pediatric neurologist and only treated children; and

(5)    Allergan furnished the specific physician with written directions on how to receive pre-approval for the administration of Botox.

## LEGAL AUTHORITY

### THE FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729 – 3733

**10.**

Braeden M. Hearrell, now an adult, has brought this action under the FCA on behalf of the United States to recover damages and civil monetary penalties from Allergan for the fraudulent conduct detailed herein.  The FCA provides that any person who knowingly presents, or causes to be presented, to the Government a false or fraudulent claim for payment or approval is liable for (a) three times the amount of the damages sustained by the Government and (b) a civil penalty ranging from $5,500 to $11,000 for each such claim.  *See* 31 U.S.C. § 3730(a); 28 C.F.R. § 85.3(a)(9).

### FCA's History, Purpose, and Provisions

**11.**

Originally enacted in 1863 in response to widespread corruption, fraud, and misuse of federal funds during the Civil War, the FCA was weakened by a 1943 amendment which

FILED IN CAMERA AND UNDER SEAL

considerably decreased the application and use of the statute. *See* 132 CONG. REC. H6474 (Sept. 9, 1986) (statement of Rep. Glickman). However, in response to a wave of procurement scandals in the mid-1980s, Congress substantially amended the FCA in 1986 to provide more effective means of identifying, stopping, and remedying fraud against the Government. *Id.* Among other things, the 1986 amendments reduced the burden of proof (to a preponderance standard), 31 U.S.C. § 3731(c), lowered the *mens rea* requirement (reducing it to reckless disregard of the truth or falsity of the submitted claim), § 3729(b)(3), increased the available damages and penalties (imposing treble damages and civil monetary penalties), § 3729(a), and extended the statute of limitations (providing between six and ten years to file an action), § 3731(b). *See generally*, 100 Stat. 3153; Pub L. 103-272.

### 12.

The 1986 FCA amendments also increased the incentives for private whistleblowers to invest their own time and resources into uncovering, reporting, and pursuing FCA violations. Under certain circumstances, these whistleblowers (known as "relators") may bring civil FCA actions (known as "*qui tam*" suits) on behalf of the United States to recover damages and penalties. *See* 31 U.S.C. § 3730(b). Relators who bring successful *qui tam* actions may receive a percentage-share of the Government's recovery.

**FCA *Qui Tam* Suits Have Recovered Billions
Stolen from the United States and Federal Health Care Programs**

### 13.

Since the FCA's 1986 amendments became effective, private *qui tam* actions have comprised a majority of new FCA matters (including referrals, investigations, and filed cases) reported by the United States Department of Justice.

FILED IN CAMERA AND UNDER SEAL

## THE FOOD DRUG AND COSMETICS ACT
## 21 U.S.C. §§ 301 – 397 &
## PUBLIC HEALTH SERVICE ACT
## 42 U.S.C. § 262, *et seq.*

### FDA Jurisdiction and
### Biological License Applications

**14.**

Under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301 – 397, and the Public Health Services Act ("PHSA"), 42 U.S.C. § 262, *et seq.*, the Federal Food and Drug Administration ("FDA") is charged with ensuring that drugs and biological products are reasonably safe and effective as well as properly labeled.

**15.**

Botox qualifies as a "drug" under the FDCA because it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" and "intended to affect the structure or function of the body of man."  21 U.S.C. § 321(g)(1).  In addition, Botox qualifies as a "biological product" under the PHSA because it is a "toxin…applicable to the prevention, treatment or cure of a disease or condition of human beings."  42 U.S.C. § 262(i); *see also* 21 C.F.R. § 600.3(h) (defining "[b]iological product" as "any…toxin…or analogous product applicable to the prevention,  treatment or cure of disease or injuries of man").  As a biologic, Botox must obtain a biological license for each of its intended uses, *see* 42 U.S.C. § 262(j).

**16.**

Biological products ("biologics"), such as Botox, are drugs derived from living material, rather than chemical synthesis.  In light of additional manufacturing, storage, and safety issues raised by biologics, they undergo a different FDA approval process than other drugs and are issued

**FILED IN CAMERA AND UNDER SEAL**

a "biologics license," when they are approved.  Other than the initial licensing process, all drug regulations in the FDCA apply to biologics with equal force and effect.  *See* 42 U.S.C. § 262(j).

**17.**

No biological products may be introduced into, or distributed through, interstate commerce unless the sponsor of the product obtains a biologics license and properly labels the product.  42 U.S.C. § 262(a)(1).  To obtain a biologics license, the sponsor must submit a biological license application ("BLA") to the FDA, 21 C.F.R. § 601.2, providing evidence that the biologic is "safe, pure, and potent," 42 U.S.C. 262(a)(2)(C)(i)(l), which means that the product has been proven effective for a specific use "by appropriate laboratory tests or by adequately controlled clinical data."  21 C.F.R. § 600.3(s).  The FDA approves new biologics based on an evaluation of the product's safety and efficacy demonstrated by randomized, prospective, and double-blind clinical trials.  21 C.F.R. § 601; FDA Release "Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products," May 1998.

**18.**

The indication and dosages approved by the FDA are set forth in the biologic's labeling, the content of which is also reviewed by the FDA as part of the BLA process.  *See, e.g.,* 21 C.F.R. §§ 600.3(dd); 601.2(b); 601.12.  The label must also reveal all medically relevant information regarding the appropriate use of the biologic, such as dosage, directions for administration, known precautions, warnings, and contraindications.  *Id.*

**FDA Prohibition on *Off-Label* Marketing**

**19.**

Once a drug is approved for a particular use the FDA does not prevent doctors from prescribing the drug for uses that are different than those approved by the FDA.  Allowing *off-*

FILED IN CAMERA AND UNDER SEAL

*label* prescriptions coincides with the FDA's mission to regulate the pharmaceutical industry without directly interfering with the practice of medicine. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).

**20.**

While physicians are permitted to prescribe drugs for *off-label* purposes, the FDCA and PHSA prohibit drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved. *See* 21 U.S.C. § 331(a), (d); 42 U.S.C. §§ 262(a)(1), (b); C.F.R. § 601.12. Under the FDCA, a manufacturer illegally "misbrands" a drug if its labeling includes information about any of the drug's unapproved uses. *Id.*

**Allergan Is Prohibited from**
**Marketing Botox for *Off-Label* Uses**

**21.**

Botox is approved to treat only adults for chronic migraine, and Allergan is prohibited from actively promoting other, "off-label," uses of Botox.

**THE MEDICARE AND MEDICAID STATUTES**
**42 U.S.C. §§ 1395 – 1395ccc, 1396 – 1396v**

**22.**

The Medicare and Medicaid programs were created through 1965 amendments to the Social Security Act, adding Title XVIII (Medicare) and Title XIX (Medicaid) to the Act. Pub. L. No. 89-87.

**The Medicare Program Structure**

**23.**

The Medicare program is a federally funded and federally administered nationwide social health insurance system that currently contains four main parts: A, B, C, and D.

FILED IN CAMERA AND UNDER SEAL

## Medicare Claims

### 24.

Medicare claims under Part A are made on Form CMS 1450/UB-92, and Medicare claims under Part B are made on Form CMS 1500.  Medical diagnoses are identified on these claim forms using the *International Classification of Diseases*, Tenth Edition, Clinical Modification (or ICD-10-CM code).  Drugs and biologicals are identified on these claim forms using the *Health Common Procedure Coding System* (or HCPCS code).  Medical services and procedures are identified on these claim forms using the *Current Procedure Terminology* (CPT codes), and the CPT codes that Medicare will cover.

### 25.

Above the price of the drug, each Medicare claim for Botox also includes a charge by the physician for injecting the drug.  Depending on the particular Botox use, the Government pays physicians a range for their services during each treatment.

## Medicare Provider/Supplier Enrollment

### 26.

All providers and suppliers must complete a Medicare enrollment form before receiving payments from the programs.  The following forms must be completed and submitted to the applicant's proper Medicare Contractor in their given region: (a) provider entities complete the CMS Form 855A to enroll in Medicare Part A; (b) supplier entities (*e.g.*, clinics and group practices) complete the CMS Form 855B to enroll in Medicare Part B; and (c) individuals (*e.g.,* physician and other practitioners) complete the CMS Form 855I to enroll in Medicare Part B.  All three CMS 855 forms contain a materially identical certification that the applicant agrees to abide by all Medicare laws, regulations, and program instructions and understands that payment of every

**FILED IN CAMERA AND UNDER SEAL**

claim is conditioned upon the transaction underlying the claim complying with the same laws, regulations, and instructions "including, but not limited to, the Federal Anti-Kickback Statute and the Stark law" and "on the [provider/supplier's] compliance with all applicable conditions of participation in Medicare." *See* CMS 855A at 37; 855B at 30; 855I at 25.

### 27.

Thus, all Medicare providers and suppliers have certified their understanding that compliance with the Federal Anti-Kickback Statute is a prerequisite to payment and no claims may be submitted for payment if the transactions underlying those claims do not comply with the Anti-Kickback Statute. *See generally, e.g., United States ex rel. Pogue v Diabetes Centers of America, Inc.*, 238 F.Supp. 2d 258, 263-66 (D.D.C. 2002) (upholding FCA claims for violations of the Federal Anti-Kickback Statute).

### Medicare's *"Reasonable and Necessary"* Requirement

### 28.

Notably, no items or services will be covered by Medicare that are not both "reasonable and necessary for the diagnosis or treatment of injury or illness… ." 42 U.S.C. § 1395y(a)(1)(A). With respect to drugs and biologicals, "reasonable and necessary" requires the drug or biologic to be prescribed for a "safe and effective" use, meaning (a) FDA-approved drug uses, or (b) medically accepted, taking into consideration the major drug compendia, authoritative medical literature and/or "accepted standards of medical practice." Medicare Benefit Policy Manual Chapter 15, § 50.4. These decisions are made by the Medicare contractors that process Medicare claims under contracts with the Centers for Medicare and Medicaid Services ("CMS"). Medicare Benefit Policy Manual, Ch. 15, § 50.2K ("Carriers and fiscal intermediaries will make the determination of

**FILED IN CAMERA AND UNDER SEAL**

reasonable and necessary with respect to the medical appropriateness of a drug to treat the patient's condition.")

**Medicare Part A**
**Coverage for Drugs and Biologicals**

**29.**

Medicare Part A covers expenses associated with inpatient hospital care, skilled nursing facility care, certain home health services, and hospice care.  These benefits are paid for through the federal Hospital Insurance Trust Fund, which is financed from payroll tax contributions from workers and employers.

**30.**

Among other things, Medicare Part A coverage includes the cost of inpatient prescription drugs, 42 U.S.C. § 1395x(b)(2), subject to the requirement that the drug is reasonable and necessary for the diagnosis or treatment of injury or disease, 42 U.S.C. § 1395y.

**Medicare Part B**
**Coverage for Drugs and Biologicals**

**31.**

Medicare Part B pays for "medical and other health care services" provided by a physician, subject to specific exclusions, *see* 42 C.F.R. § 424.24, as well as drugs and biologics that are provided incident to the service of a physician, *see* 42 U.S.C. §§ 1395x(s)(2)(A); 42 C.F.R. § 410.26.  Incident to the services of a physician means the drug is provided in the office of a physician and under the physician's or practitioner's direct supervision.  42 C.F.R. § 410.26(b); 410.29(a); 42 U.S.C. §§ 1395x(s)(2)(A).

FILED IN CAMERA AND UNDER SEAL

### The Medicaid Program
### Structure and Funding

**32.**

The federal Medicaid statute, 42 U.S.C. §§ 1396 – 1396v, offers federal matching funds to states that establish Medicaid plans providing certain vulnerable populations with access to basic health care.  All 50 states have created Medicaid programs, which are overseen by the Secretary of Health and Human Services, but administered by Medicaid agencies and directors in the individual states.

**33.**

The state Medicaid programs are jointly financed by the federal and state governments.  In general, the federal government pays a majority of the cost of health care provided in each state program.  The percentage allocated to the federal government (known as the "Federal Medical Assistance Percentage" or "FMAP") is determined separately for each state – based upon that state's per capital income – and is recalculated annually.

### Medicare Payment for
### Drugs and Biologicals

**34.**

With narrow exceptions, reimbursement for pharmaceuticals under Medicaid is available only for "covered outpatient drugs."  42 U.S.C. § 1396b(i)(10).  A drug may qualify as a "*covered outpatient drug"* only when it is used for a *"medically accepted indication."*  42 U.S.C. § 1396r-8(k)(2) – (3) (emphasis added).  A "medically accepted indication" means any (a) FDA-approved use of a drug or (b) use which is included and approved in at least one of the statutorily specified drug compendia identified in 42 U.S.C. 1396r-8(g)(1)(B)(i).  42 U.S.C. § 1396r-8(d)(6).

FILED IN CAMERA AND UNDER SEAL

## ALLERGAN'S FALSE AND
## <u>FRAUDULENT PRACTICES</u>

## CORPORATE KNOWLEDGE AND INTENT

### 35.

Allergan furnishes its regional sales representatives with monthly reports which track every prescription for Botox, including chronic migraine. Allergan knows, based on these prescriptions, whether the patients were adults or children. Allergan adjusts its bonuses for its sales representatives to allow for maximum Allergan profit related to pediatric use of Botox to treat chronic m1grame. The numbers involving Botox for pediatric migraine are systematically tracked by Allergan and Allergan knows exactly which patients received Botox and for which conditions. Allergan has conducted various clinical trials in an effort to establish the safety and efficacy of Botox for migraines in children. Each of these clinical trials has failed. Despite these failures, Allergan promotes the use of Botox to treat chronic migraine in children.

## ALLERGAN'S FRAUDULENT *OFF-LABEL*
## MARKETING PRACTICES

### 36.

Despite the prohibition against promotion of drugs for *off-label* use and the restrictions on Allergan's communications regarding *off-label* use, Allergan has for years engaged in a sophisticated and comprehensive effort to promote the *off-label* use of Botox to treat chronic migraine in children.

The FDA has never approved Botox as a treatment for chronic migraine in children. Nevertheless, Allergan uses a multi-prong approach to promote Botox use for chronic migraine in children.

FILED IN CAMERA AND UNDER SEAL

**ILLUSTRATIVE ALLERGAN
*OFF-LABEL* MARKETING CAMPAIGN:
PROMOTING BOTOX FOR THE
TREATMENT OF CHRONIC MIGRAINE IN CHILDREN**

**37.**

For example, Allergan sponsors a website at the web address:

mychronicmigraine.com.  This website is promoted and run by Allergan and invites patients to

take various online tests to determine whether they are a candidate for Botox to treat chronic

migraine.  The same website also invites users to enter their zip code and Allergan furnishes a list

of nearby physicians (along with the address and physician contact information) that provide Botox

injections to treat chronic migraine.  This list of Allergan-recommended physicians includes

pediatric neurologists that only treat children.

**Allergan Trains Its Employees to
Market Botox *Off-Label* to Treat Chronic Migraine in Children**

**38.**

Allergan trains its regional salespeople (Health Systems Managers) and its Medical

Scientific Liaisons ("MSLs") to use specific physicians selected by Allergan and identified as Key

Opinion Leaders.  These Key Opinion Leaders are defined as physicians who like Botox and are

influential among their peers.  The Health Systems Managers provide PowerPoint presentations to

groups of physicians coordinated by and through Key Opinion Leaders to promote the use of Botox

for chronic migraine in children.  Allergan makes cash payments to these Key Opinion Leaders

for promoting the use of Botox for *off-label* uses in children.

Allergan also uses Medical Scientific Liaisons to host promotional dinners attended by Key

Opinion Leaders and pediatric specialists related to the promotion of Botox for chronic migraine.

Allergan employees attend these dinners and pay all the bills.

**FILED IN CAMERA AND UNDER SEAL**

Allergan trains its Health Systems Managers (Botox salespeople) to provide injection training to physicians and their staff, including pediatric specialists.  This injection training involves an anatomically correct human bust model that is brought to the injection training and the Allergan employees demonstrate to physicians, including pediatric specialists, the proper injection protocol for Botox for chronic migraine treatment.

These same Health Systems Managers (Botox salespeople) direct physicians to Allergan "health care provider only" websites that furnish exemplar letters to assist physicians in securing pre-approval for Botox injections.

All of the activities set forth above are part of Allergan's training for its employees related to the promotion of Botox for the unapproved treatment of minors for chronic migraine.

### Allergan Uses Its Employees to Coordinate Its Marketing of Botox's *Off-Label* Use for Treatment of Chronic Migraine in Children

### 39.

Allergan uses its personnel and assigns various titles to suggest their roles are only to be helpful to physicians.  For example, Allergan uses "Medical Scientific Liaisons" ("MSLs") who host promotional dinners along with Key Opinion Leaders to promote the off-label use of Botox to treat children for chronic migraine.

Allergan also requires that its regional salespeople contact Key Opinion Leaders on a periodic basis to promote and encourage the sale of Botox to treat chronic migraine in minors.

Allergan gives it regional sales representatives memoranda identifying the Key Opinion Leaders in their region.  Allergan also provides its regional salespeople with annual goals that include the number of contacts with Key Opinion Leaders and goals for injection training which Allergan claims is the greatest predictor of whether a physician will follow through and prescribe

**FILED IN CAMERA AND UNDER SEAL**

Botox for chronic migraine.  One of the ways in which Allergan violated the Federal Anti-Kickback Statute was through its Key Opinion Leader recognition program.  Key Opinion Leaders were given cash payments in exchange for promoting the use of Botox at lavish promotional dinners that were also attended by Allergan's Medical Scientific Liaisons ("MSLs") and pediatric specialists.

Allergan would encourage Key Opinion Leaders to invite physicians to attend these lavish dinners where so-called Medical Scientific Liaisons would show a slide deck extolling the virtues of Botox for treatment of chronic migraine.  These promotional dinners specifically included pediatric specialists.  Allergan employees with managerial capacity knew that these pediatric specialists were both invited to these dinners and attended these dinners.  Specifically, the Allergan managers (with managerial capacity over the sales force) were informed in terms of invitations extended and information related to the individual doctors who expressed a desire to attend the promotional dinners.  Following the promotional dinners, the Allergan MSLs filled out a detailed form that specifically identified the product that was promoted, i.e., Botox.  The form also identified the individual physicians present, including the Key Opinion Leaders and other Allergan employees.  This form had to be approved by the MSLs' manager prior to submission to Allergan. The information on this form was used for various internal purposes by Allergan.

**ALLERGAN KICKBACKS TO PHYSICIANS**

**40.**

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits any person from knowingly and willfully offering or paying any renumeration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to

**FILED IN CAMERA AND UNDER SEAL**

purchase, order, arrange for, or recommend purchasing or ordering any good, service, or item for which payment may be made (in whole or in part) under a Federal health care program.

**41.**

Allergan has knowingly and willfully offered and paid renumeration directly to Key Opinion Leaders (physicians) to induce those physicians to purchase, order, or arrange for the purchasing or ordering of Botox where payment would be made (in whole or in part) under a Federal health care program.

**42.**

Allergan has also knowingly and willfully offered and paid renumeration directly to physicians to induce those physicians to promote the ordering of services, consisting of the injection of Botox for chronic migraine in children, for which payment may be made (in whole or in part) under a Federal health care program.

**FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1), (a)(2) and (a)(3)**

**43.**

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 42 of the Complaint.

**44.**

This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

**45.**

Defendant, by and through its officers, agents, and employees, knowingly caused to be presented to an officer or an employee of the United States Government a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

FILED IN CAMERA AND UNDER SEAL

**46.**

Defendant, by and through its officers, agents, and employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States Government in violation of 31 U.S.C. § 3729(a)(2).

**47.**

As set forth in the preceding paragraphs, Defendant conspired with private physicians, other health care providers, and other third-party interests who assisted Defendant in its illegal *off-label* marketing campaign to defraud the United States by getting false and/or fraudulent Medicare and Medicaid claims paid in violation of 31 U.S.C. § 3729(a)(3).

**48.**

Defendant, by and through its officers, agents, and employees, authorized and encouraged the actions of its various officers, agents, and employees to take the actions set forth above.

**49.**

As a result of the acts of Defendant, the United States Government reimbursed physicians for treatments that it otherwise would not have had Defendant not presented false or misleading information to the physicians in an effort to promote *off-label* and medically unnecessary treatments.

**50.**

Each prescription that was written as a result of Defendant's illegal marketing practices and/or illegal inducements represents a false or fraudulent record or statement.  Each claim for reimbursement for such *off-label* or illegally induced prescriptions submitted to a federal health insurance program represents a false or fraudulent claim for payment.

FILED IN CAMERA AND UNDER SEAL

**51.**

By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.  Federal health insurance programs have paid numerous claims for *off-label* prescriptions for indications that were not approved by the FDA, not reasonable and necessary to diagnose or treat patients, and/or otherwise induced and caused by Defendant's fraud.  These prescriptions and the corresponding claims to federally funded health care programs were a foreseeable and intended result of Defendant's illegal acts.

**52.**

As set forth in the preceding paragraphs, Defendant has knowingly violated 31 U.S.C. § 3729 *et seq*. and has thereby damaged the United States Government by its actions in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of himself and the United States Government, pray that judgment be entered against Defendant and that forms of relief required by law and justice be awarded including:

(a)    Judgment against Defendant in an amount equal to three times the amount of damages the United States Government has sustained because of its action, plus a civil penalty of $5,500 to $11,000 for each violation of 31 U.S.C. § 3729, Relator's attorneys' fees and litigation expenses, and other costs of this action, with interest, including the costs of the United States Government for its expenses related to this action;

(b)    An award to Relator in the event that the United States Government continues to procced with this action, of an amount for brining this action in the amount of at least 15 percent of the proceeds of the action or settlement of the claims;

**FILED IN CAMERA AND UNDER SEAL**

(c)    An award to Relator in the event that the United States Government does not proceed with

this action, in the amount of at least 25 percent of the proceeds of the action or settlement

of the claims;

(d)    Trial by jury on all issues;

(e)    Relief to the United States Government and Relator both at law and at equity, to which

they may reasonably appear entitled.

<u>**DEMAND FOR JURY TRIAL**</u>

Relator, on behalf of himself and the United States, demands a jury trial on all claims

alleged herein.


Dated: June 7, 2021                              Respectfully submitted,

*/s/ Melissa R. Smith*
Melissa R. Smith
State Bar No. 24001351
**GILLAM & SMITH, LLP**
303 S. Washington Avenue
Marshall, Texas 75670
Email: melissa@gillamsmithlaw.com
T:  (903) 934-8450 | F:  (903) 934-9257

Alexander B. Klein III
State Bar No. 11556250
**THE KLEIN LAW FIRM**
3737 Buffalo Speedway, Suite 1900
Houston, Texas 77098
Email: alex@thekleinlawfirm.com
T:  (713) 650-1111 | F:  (713) 227-1121


**ATTORNEYS FOR RELATOR**